Timothy M. Stubson (Wyo. BAR No. 6-3144)
CROWLEY FLECK PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
tstubson@crowleyfleck.com
Telephone:  307-265-2279

Kevin T. Schutte, TBN 24033050
(*Pro Hac Vice* Forthcoming)
William P. Dunne III, TBN 24097631
(*Pro Hac Vice* Forthcoming)
OTTESON SHAPIRO LLP
4851 Lyndon B Johnson Freeway, Suite 650
Dallas, TX 75244
Telephone: (214) 619-8309

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **FLATIRONS BANK** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | CASE NO.  _____ |
| | § | |
| **EASTERN POINT TRUST COMPANY** | § | |
| | § | |
| **Defendant** | § | |

## COMPLAINT AND JURY DEMAND

Plaintiff Flatirons Bank ("Flatirons") hereby files its Complaint and Jury Demand (the "Complaint") against Eastern Point Trust Company, and states the following in support:

### I.    INTRODUCTION

1.      Defendant Eastern Point Trust Company ("EPTC") has launched an aggressive, unlawful campaign against Flatirons in an attempt to stifle Flatiron's Qualified Settlement Fund ("QSF") business and steal Flatirons' market share. EPTC has targeted Flatirons' business partners and clients and demanded that they cease doing business with Flatirons or else face frivolous litigation. Specifically, EPTC has concocted a fictious and outlandish narrative that Flatirons'

proprietary QSF platform, which Flatirons created from scratch, somehow copies or infringes on EPTC's outdated QSF offering. Nothing could be further from the truth, and EPTC has already failed at attempting to bring claims against Flatirons on these baseless assertions. Despite knowing that these accusations are false, EPTC, and its affiliate entities, Account Management Services, LLC ("AMS") and Quantum Fintech LLC ("Quantum"), sent a series of letters to Flatirons, its business partners, clients, and governmental entities threatening litigation against the companies, individuals, and their attorneys if the partners and clients continued to do business with Flatirons. These letters restated false accusations against Flatirons, including alleging that Flatirons and others engaged in criminal activity such as theft and espionage. EPTC's corrupt scheme to quash Flatirons' QSF business has caused Flatirons significant economic and reputational harm, thereby forcing Flatirons to protect its reputation, its business operations, and its relationships with its clients and business partners through filing this Complaint.

2. EPTC's conduct is nothing more than an effort to quash legitimate competition; indeed, the Internal Revenue Service leaves little to the imagination in terms of the establishment and administration of QSF services, given how the IRS itself clearly lays out the parameters in 26 CFR § 1.468B-1 of the Internal Revenue Code. For years, EPTC has enjoyed an unchecked position in the QSF marketplace without meaningful innovation or challenge. Now that Flatirons has introduced a modern, proprietary software platform designed from the ground up, EPTC seeks to weaponize litigation threats and smear tactics to maintain its monopoly. This is not what the law allows, nor is it what free enterprise stands for. Flatirons' entry into the market represents exactly the kind of fair competition and entrepreneurial spirit that America was built on: businesses succeed by improving products, lowering costs, and offering better service, not by attempting to intimidate customers or partners with false allegations and frivolous lawsuits. EPTC's campaign

is not only unlawful but also an affront to the very principles of innovation and open competition that drive our economy.

3.       EPTC's conduct is not simply heavy-handed business maneuvering. It is the type of anticompetitive behavior Wyoming law was designed to prevent. EPTC's coordinated scheme with its affiliates, AMS and Quantum, to threaten litigation and spread false allegations in order to drive Flatirons out of the QSF marketplace is a textbook example of an unlawful attempt to restrain competition.

4.       Rather than competing on the merits by improving its own outdated QSF platform, EPTC is using coercive threats against clients and business partners to block market access for Flatirons. This conduct is designed not to protect consumers, but to preserve EPTC's complacent monopoly in the QSF market and stifle the very innovation and efficiency that competition is meant to foster. Flatirons' entry into the marketplace represents lawful competition and technological advancement. EPTC's response, seeking to eliminate a rival through intimidation rather than legitimate market performance, runs directly counter to the principles enshrined in the Constitution of the State of Wyoming.

## II.     PARTIES, JURISDICTION AND VENUE

5.       Flatirons is a Colorado state bank, with its principal place of business located at 1095 Canyon Blvd., Suite 100, Boulder, CO 80302.

6.       Defendant EPTC is a company incorporated under the laws of the U.S. Virgin Islands, headquartered in St. Thomas, U.S. Virgin Islands.

7.       Upon information and belief, EPTC does not conduct business in the U.S. Virgin Islands and is incorporated there solely to obtain tax benefits.

8.       Upon information and belief, EPTC conducts the majority of its business in

Warrenton, Virginia.

9.      There is complete diversity of citizenship between the parties.

10.     Based on EPTC's ongoing malicious conduct, described herein, Flatirons has and continues to suffer damages; therefore, an actual controversy has arisen between the parties.

11.     Flatirons' economic damages claim exceeds $75,000.

12.     This Court has jurisdiction under 28 U.S.C. § 1332 due to the diversity of citizenship between Flatirons on one hand, and EPTC on the other, and because the amount in controversy exceeds $75,000.

13.     This Court also has the power to issue declaratory judgments in this case pursuant to 28 U.S.C. §§ 2201 and 2202.

14.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because EPTC tortiously interfered with Flatirons' contracts and business relationships that were made and performed in Wyoming.

## III.    FACTUAL ALLEGATIONS

15.     Flatirons incorporates all preceding paragraphs as if fully set forth herein.

16.     In 2023, Flatirons opened Justice Escrow[1], a division dedicated to providing superior customer service and value in the QSF industry to benefit attorneys and their clients. Flatirons serves as the administrator of, and escrow agent for, the QSFs that it manages through Justice Escrow. Flatirons is well positioned to serve in these capacities as a regulated financial institution.

17.     As mentioned previously, QSF's are special accounts created pursuant to 26 CFR § 1.468B-1 of the Internal Revenue Code to hold and distribute settlement proceeds in legal

---

[1] "Justice Escrow" as used herein refers to the QSF escrow products and services offered by Flatirons.

settlements involving one or more claimants.

18.    QSF's allow defendants to pay settlement proceeds into the fund, thereby providing finality and release from liability, while also receiving an immediate tax deduction,. QSFs provide claimants with time and flexibility to evaluate structured settlement options, address liens, and allocate proceeds.

19.    One of the hallmark characteristics of the QSF as set forth in 26 CFR § 1.468B-1 of the Internal Revenue Code is that the formation and administration of each QSF must be approved by a governmental authority.

20.    For many years prior to Flatirons' Justice Escrow, EPTC enjoyed having few competitors in the QSF industry and controlled a significant portion of the QSF market.

21.    In fact, EPTC and Flatirons had never interacted with each other until Flatirons began successfully attracting clients to its superior and more user-friendly QSF platform: Justice Escrow.

22.    Unable to retain certain of its customers due to Flatirons' better QSF offering, EPTC began its unscrupulous campaign to quash Flatirons' business in the QSF space and fabricated its egregious story that Flatirons is infringing on EPTC's QSF platform. EPTC's narrative has no basis in fact or reality and is nothing more than an example of EPTC's unlawful business practices.

23.    The Justice Escrow QSF platform in no way infringes on EPTC's platform and the market should be left to determine which offering clients prefer.

24.    EPTC endeavored to stifle fair competition from Justice Escrow by initiating a letter-writing campaign to Flatirons, its customers, governmental authorities, and business partners, demanding they cease doing business with Flatirons.

25.     Specifically, EPTC interfered with Flatirons' governmental authority in Wyoming by making outlandish and unsupported allegations regarding Flatirons, including patently false statements that Flatirons had engaged in espionage and theft to create Justice Escrow.

26.     EPTC has threatened legal action against governmental authorities and other parties doing business with Flatirons.

27.     One of the targets of EPTC's unlawful assault was the Town of Lovell, Wyoming ("Lovell").

28.     Flatirons entered into a valid and enforceable contract with the Office of the Town Administrator, for Lovell to approve the establishment of QSF funds as contemplated by § 468B of the Internal Revenue Code pursuant to the terms and conditions set forth therein (the "Lovell Contract").

29.     Flatirons relied on the Lovell Contract to establish QSF funds through Justice Escrow and proceeded to establish and administer QSF's with Lovell's approval and continuing jurisdiction pursuant to the Lovell Contract.

30.     EPTC and its affiliates, AMS and Quantum, sent Lovell a series of letters containing EPTC's misrepresentations regarding Justice Escrow.

31.     The letters demanded that Lovell immediately cease and desist from any and all business with Flatirons, including approving QSFs as required by the Lovell Contract.

32.     EPTC threatened to sue Lovell for (unsubstantiated) damages purportedly exceeding $100,000,000.

33.     Further, AMS and Quantum, without any basis in law or fact, threatened to file a lawsuit against Lovell in the Commonwealth of Puerto Rico.

34.     Unfortunately, EPTC's bullying tactics caused Lovell to cease doing business with

Flatirons.

35.     As a direct result of EPTC's baseless accusations and tactics to undermine Flatirons' ability to accept new QSFs, Lovell entered into a settlement with EPTC, AMS, and Quantum, and terminated its contract with Flatirons without providing Flatirons 90-days notice as obligated under the Lovell Contract.

36.     Since Lovell's sudden and immediate breach of contract and decision to no longer review and/or approve Justice Escrow QSFs, Flatirons was forced to find another governmental authority or risk further significant business disruption to Justice Escrow.

37.     During this break in business without a governmental authority, Flatirons lost out on business opportunities, suffered harm to its reputation in the industry, and incurred costs in establishing a new relationship with another governmental authority.

38.     In another attempt to harm Flatirons' reputation in the industry, EPTC interfered with Flatirons' ability to sponsor the Society of Settlement Planners' ("SSP") Annual Conference on February 26-28, 2025.

39.     According to SSP's website, SSP is "the professional trade organization for those who engage in settlement planning. The SSP is focused on building the profession of settlement planning through regular collaboration of its members and annual conferences. SSP members include settlement planners, structured settlement specialists, attorneys, product providers, and other professionals."

40.     The SSP focuses on the specific industries that drive business towards Justice Escrow and EPTC.

41.     Although SSP's website advertised sponsorship opportunities for its Annual Conference, SSP refused to accept Flatirons as a sponsor of the Annual Conference.

42.    Upon information and belief, EPTC's representatives improperly influenced the SSP board using false statements about Flatirons' and Justice Escrow to cause SSP to decline Flatirons' sponsorship money.

43.    Specifically, Joe Tombs, President of SSP, explained, "Since the sponsorship comes with our commitment to promote your organization and its products and strategies, some of our Board Members expressed concerns about one or more of the techniques or strategies enabled by your firm. Therefore, this will need to be reviewed carefully by our legal committee before we can accept a sponsorship and we do not have adequate time before this annual meeting to undertake such a review."

44.    Seemingly unsatisfied with its interference with Flatirons' relationship with Lovell and SSP, on April 2, 2025, EPTC brought a baseless, inflammatory, and ultimately unsuccessful lawsuit against Flatirons.

45.    Importantly, and by design, EPTC did not promptly serve the lawsuit on Flatirons and instead, upon information and belief, sent it to an industry blogger and others, including John Darer and Chris Bua of Bua Settlements and Mirena & Company, so they could post the news on their websites on April 3, 2025 and gain industry press concerning the lawsuit without the benefit of a response from Flatirons.

46.    Upon information and belief, Darer and Bua are affiliated with EPTC and Bua serves as a member of the Board of Directors for an EPTC venture commonly known as The Plaintiff Fund.

47.    Additionally, Bua was the incoming President of SSP when SSP revoked its invite to Flatirons to be a sponsor at the annual conference previously referenced herein.

48.    EPTC did not serve the lawsuit on Flatirons until April 29, 2025.

49.     The failure to serve Flatirons before intentionally weaponizing the filed Complaint to tarnish Flatirons' business reputation underscores the bad faith in EPTC's approach.

50.     Flatirons is a transparent and established business that could have been served without delay by any process server walking through the front door.

51.     Instead, EPTC intentionally withheld service for nearly a month, ensuring that Flatirons had no opportunity to respond while hit-piece bloggers and connected insiders circulated one-sided coverage.

52.     By withholding service, EPTC obtained the full benefit of generating negative publicity and market suspicion against Flatirons without the risk of Flatirons correcting the record through a formal response.

53.     Upon Flatirons' filing a motion to dismiss, EPTC dismissed its Complaint before it was required to file a response brief.

54.     EPTC's rapid retreat from litigation in the face of Flatirons' dismissal motion shows that EPTC knows its allegations are baseless and is only using the judicial system as a weapon against Flatirons and its business partners and clients. The lies contained in EPTC's complaint against Flatirons, while dismissed, are now a matter of public record.

55.     Not surprisingly, none of the individuals or entities who were provided the Complaint by EPTC published anything regarding Flatirons' motion to dismiss or EPTC's ultimate voluntary dismissal of the lawsuit.

56.     Darer continues to publish information favorable to EPTC and not favorable to Flatirons.

57.     After EPTC's failed lawsuit against Flatirons, counsel for EPTC issued its own

press releases to garner more industry attention in favor of its client and harmful to Flatirons.[2]



## Eastern Point Trust Company vs. Flatirons Bank et al.

The case against Flatirons Bank and its cohorts in the joint venture operating as Justice Escrow grows stronger by the day. Documents recently produced by certain governmental entities provide clear evidence that the Justice Escrow QSF platform is nothing more than Eastern Point Trust Company's QSF 360 platform by another name.

May 29, 2025 15:30 ET | Source: Dycio & Biggs Attorneys at Law      Follow

Fairfax, VA, May 29, 2025 (GLOBE NEWSWIRE) -- May 29, 2025, Fairfax, VA: The case against Flatirons Bank and its cohorts in the joint venture operating as Justice Escrow grows stronger by the day. Documents recently produced by certain governmental entities provide clear evidence that the Justice Escrow QSF platform is nothing more than Eastern Point Trust Company's QSF 360 platform by another name. Dycio & Biggs Attorneys at Law, now intend to file a new complaint against Flatirons Bank and the other Justice Escrow defendants based on this newly acquired information. The ensuing complaint will largely mirror the allegations in the prior complaint, while also materially expanding the named defendants and increasing the damages claims. Necessarily, the original action was dismissed voluntarily, and not as a result of any court ruling, and in no way prejudices Eastern Point Trust Company from proceeding against the defendants in the forthcoming action, which shall take precedence over the prior proceedings.

**About Eastern Point Trust Company**

Eastern Point Trust Company is a pioneering and innovative trust administration service provider delivering personalized solutions to attorneys, individuals, families, and institutions. With a steadfast commitment to excellence and integrity, Eastern Point Trust Company offers a comprehensive range of trust-based and ministerial solutions. For more information, see: www.easternpointtrust.com

58.     Unlike the representation made in its press release, EPTC did not "file a new complaint against Flatirons…" See supra footnote 2.

59.     Unable to end Flatirons' dealings in the QSF space with a frivolous lawsuit, EPTC

---

[2]     https://www.globenewswire.com/news-release/2025/05/29/3090673/0/en/Eastern-Point-Trust-Company-vs-Flatirons-Bank-et-al.html

returned to intimidating Flatirons' governmental authority. EPTC sent records requests to virtually every municipality in Wyoming to discover who was approving QSFs for Justice Escrow. Through its abuse of open records requests, EPTC discovered that the Town of Glenrock ("Glenrock") agreed to work with Flatirons to approve Justice Escrow QSFs.

60.     EPTC is actively and aggressively interfering with Flatirons' business relationship with Glenrock, including through a letter writing campaign demanding that Glenrock cease and desist approval of QSFs for Justice Escrow. In an extraordinary exercise of extralegal tactics, EPTC threatened to file a legal action against the attorneys representing Glenrock and their firms in the hope Glenrock will quit approving QSFs.

61.     It is clear that EPTC will continue to unlawfully interfere with Flatirons' necessary business partners unless and until this Court enjoins EPTC from further defamatory, discriminatory and anticompetitive activity, and orders EPTC to remedy the significant harm it has caused Flatirons. Flatirons continues to lose large business opportunities because of EPTC's baseless and false representations about Flatirons and Justice Escrow.  Particularly, through EPTC's use of blogger John Darer, and EPTC's made-up "news" articles, EPTC continues to spread lies about the failed lawsuit it brought against Flatirons as well as the validity of Justice Escrow's QSF program. In the face of EPTC's continuing assault on its character and right to engage in the QSF business, Flatirons is compelled to bring this action.

62.     All conditions precedent to bringing this action have been satisfied, waived or excused.

### IV.     FIRST CAUSE OF ACTION – INTERFERENCE WITH A CONTRACT OR PROSPECTIVE ECONOMIC ADVANTAGE (LOVELL)

63.     Flatirons incorporates all preceding paragraphs as if fully set forth herein.

64.     The Lovell Contract was a valid and binding contract between Flatirons and Lovell.

65.     EPTC was not a party to the Lovell Contract.

66.     The Lovell Contract was an agreement for Lovell to approve the establishment of QSF funds.

67.     Flatirons' contractual relationship with Lovell was integral to operating Justice Escrow.

68.     EPTC knew about Flatirons' contractual relationship with Lovell, and that the town's approval of QSF funds was a critical component of the Justice Escrow QSF program.

69.     EPTC intentionally and improperly interfered with Flatirons' contract with Lovell.

70.     EPTC improperly interfered, including by sending baseless and intimidating Cease and Desist letters and a draft Complaint to Lovell, claiming that Lovell could be liable to EPTC for in excess of $100,000,000 unless a settlement is reached wherein Lovell must cease approval of QSFs for Flatirons.

71.     EPTC interfered with the Lovell Contract with the goal of causing Lovell to terminate the Lovell Contract.

72.     As a result of EPTC's intentional and improper interference with Flatiron's contractual relationship with the Town of Lovell, Lovell terminated its relationship with Flatirons.

73.     Flatirons sustained damages as a result of EPTC's improper interference with the Lovell Contract, in an amount to be proven at trial.

## V.     SECOND CAUSE OF ACTION – INTERFERENCE WITH A CONTRACT OR PROSPECTIVE ECONOMIC ADVANTAGE (GLENROCK)

74.     Flatirons incorporates all preceding paragraphs as if fully set forth herein.

75.     Flatirons entered into an oral agreement with Glenrock (the "Glenrock Agreement") to approve the establishment of QSF funds.

76.     The Glenrock Agreement is a valid and binding contract between Flatirons and

Glenrock.

77.     EPTC is not a party to the Glenrock Agreement.

78.     Flatirons' relationship with Glenrock is integral to operating Justice Escrow.

79.     EPTC knew about Flatirons' relationship with Glenrock, and that the town's approval of QSF funds is a critical component of the Justice Escrow QSF program.

80.     EPTC intentionally and improperly interfered with the Glenrock Agreement, including by sending baseless and intimidating Cease and Desist letters to Glenrock and its legal counsel, and threatening to bring legal action against Glenrock and its legal counsel unless Glenrock ceases doing business with Flatirons.

81.     EPTC's intentional and improper interference with the Glenrock Agreement is ongoing.

82.     Flatirons has lost business opportunities and economic advantage, and incurred, and will continue to incur, damages as a result of EPTC's interference with the Glenrock Agreement, including attorney fees and costs and loss of business for Justice Escrow.

83.      EPTC's unlawful conduct has caused and will continue to cause irreparable harm to Flatirons.  Therefore, Flatirons is also entitled to injunctive relief restraining such conduct and other equitable and legal relief in an amount to be proven at trial.

### VI.     THIRD CAUSE OF ACTION – DECLARATORY JUDGMENT

84.     Flatirons incorporates all preceding paragraphs as if fully set forth herein.

85.     EPTC repeatedly accused Flatirons of breaching a contract with EPTC.

86.     EPTC included its accusations against Flatirons in public filings, and in correspondence issued to businesses with which Flatirons is doing business.

87.     In Cease and Desist letters issued to Flatirons and others, EPTC alleges that "Terms

and Conditions" are noted on its website.

88.    The "Terms and Conditions" are listed in a browserwrap format on EPTC's publicly available web site, which does not require a party to indicate that they assent to same.

89.    EPTC alleges that the Terms and Conditions in EPTC's browserwrap created a binding contract between Flatirons and EPTC.

90.    EPTC also alleges that Flatirons stole EPTC's intellectual property, including coding from EPTC's QSF platform, to create the Justice Escrow platform.

91.    EPTC, through its legal counsel, has also publicly asserted in web articles and/or press releases that the "Justice Escrow QSF platform is nothing more than EPTC Point Trust Company's QSF 360 platform by another name."

92.    These accusations are untrue and are damaging to Flatirons' business reputation.

93.    Flatirons denies that it entered into a binding contract with EPTC, via the browserwrap "Terms and Conditions" or otherwise.

94.    Flatirons maintains that EPTC's intellectual property allegations are baseless, including because the Justice Escrow platform was created using original coding from the ground up.

95.    EPTC's accusations of breach of contract and theft against Flatirons and others have caused and continue to cause damage to Flatirons, including in the form of lost business relationships and intimidation of Flatirons' business partners and prospective clients.

96.    Flatirons requests that this Court enter a declaratory judgment:

      a.    That the "Terms and Conditions" browserwrap on EPTC's web site does not form the basis of a binding contract;

      b.    That there is no binding contract between EPTC and Flatirons.

97.    Flatirons also requests that this Court enter a declaratory judgment that the Justice

Escrow platform coding does not copy the coding underlying EPTC's QSF platform.

## VII.    FOURTH CAUSE OF ACTION - TRADE DISPARAGEMENT/DEFAMATION

98.    Flatirons incorporates all preceding paragraphs as if fully set forth herein.

99.    As set forth above, EPTC made false and defamatory communications concerning Flatirons.

100.    EPTC published or caused the unprivileged publication of the defamatory statements about Flatirons to one or more third parties.

101.    EPTC published or caused the unprivileged publication of the defamatory statements about Flatirons, including but not limited to Lovell, Glenrock, blogger John Darer, and the public at large.

102.    Any alleged conditional privilege was lost including but not limited to by publication of the statements without reasonable grounds for belief in their truth, and/or publication of the defamatory matter for some improper purpose, and/or by excessive publication.

103.    The defamatory communications included, but were not limited to, false statements of fact that Flatirons engaged in illegal activity including corporate espionage and theft.  These and other false statements made by EPTC convey conduct, characteristics and/or conditions that adversely affect third parties' perception of Flatirons' fitness to lawfully engage in the QSF business, and are defamatory *per se*.

104.    At the time of publication, EPTC knew that the communications were false, and/or acted in reckless disregard of whether the communication was false.

105.    Alternatively, EPTC acted negligently in failing to ascertain whether the communication was false.

106.    As a result of EPTC's trade disparagement and defamation, Flatirons' has suffered, and continues to suffer, economic damages, loss of professional reputation, and lost business

opportunities.

## VIII.   FIFTH CAUSE OF ACTION - FALSE ADVERTISING IN VIOLATION OF 15 U.S.C. § 1125(A)(1)

107.    Flatirons incorporates all preceding paragraphs as if fully set forth herein.

108.    EPTC and Flatirons are direct competitors in the QSF market.

109.    EPTC on its own and through its agents made false or misleading descriptions of fact or representations of fact regarding Flatirons' services provided through Justice Escrow, including but not limited to statements and representations that: Flatirons acted unlawfully in the creation of Justice Escrow, and that there is "clear evidence that the Justice Escrow QSF Platform is nothing more than Eastern Point Trust Company's QSF 360 platform by another name."[3]

110.    EPTC also made published statements implying that the Town of Lovell appropriately terminated its contractual relationship with Flatirons because Flatirons was infringing on EPTC's property rights.

111.    The false or misleading descriptions and/or representations of fact regarding Flatirons and Justice Escrow misrepresent the nature and inherent characteristics of the Justice Escrow platform, which was independently derived from the ground up, and is superior to EPTC's stale QSF offerings.

112.    The statements were made in commercial advertising or promotion for EPTC for the purpose of influencing consumers to use EPTC's services and forgo use of Justice Escrow due to the unsubstantiated and untrue assertions cast against Flatirons' business ethics and practices, and misrepresentation of the inherent character of Justice Escrow as a "copycat" product or service "stolen" from EPTC.

113.    The statements were widely disseminated to the relevant purchasing public through

---

[3] *See, e.g.* press releases to *Newswires* and other outlets by Dycio & Biggs, Attorneys at Law, counsel for EPTC.

press releases in various media outlets, quotes provided for news articles, and blog posts which, upon information and belief, were made at the behest of EPTC to sow fear regarding the legality of Justice Escrow's offerings, and disparage Flatirons.

114.    The statements and misrepresentations are literally false or misleading in context and are material because they are likely to deceive consumers.

115.    Flatirons has been injured as a result of the false advertising, and likely will suffer additional harm in the future including through loss of current and future business relationships and clients.

116.    Certain attorneys have already advised Flatirons that they will not do business with Justice Escrow due to the questions surrounding EPTC's widely publicized allegations against Flatirons, including those set forth above.

117.    Flatirons is entitled to compensatory damages in an amount to be proven at trial, its attorney fees and costs, and all other relief available for violations of 15 U.S.C. § 1125(a)(1).

118.    Flatirons also seeks an injunction prohibiting EPTC from engaging in further promotion setting forth untrue statements regarding Flatirons' and Justice Escrow's services and business ethics.

## IX.    SIXTH CAUSE OF ACTION – VIOLATIONS OF WS 40-4-114

119.    Flatirons incorporates all preceding paragraphs as if fully set forth herein.

120.    It is the public policy of the State of Wyoming that "…[M]onopolies are contrary to the genius of a free state, and shall not be allowed…"

121.    As set forth above, EPTC became a party to a conspiracy with one or more third parties including, but not necessarily limited to, AMS and Quantum, to prevent or substantially lessen competition in the QSF industry and/or create a monopoly and/or control or influence the prices of QSF services in the legal industry throughout the United States.

122.    EPTC's and its conspirators (collectively, the "EPTC Conspirators") engaged in the discriminatory, anti-competitive actions in the State of Wyoming as set forth in this Complaint, including but not limited through interference with competitors, and intimidation of Wyoming municipalities, officers of the Court, and Wyoming residents and business to cease doing business with QSF competitors, including Flatirons, or face legal action.

123.    EPTC Conspirators have also published, or caused to be published, untrue statements disparaging to the business reputation of Flatirons and individuals involved in offering QSF products that directly compete with EPTC's offerings.

124.    The EPTC Conspirators' actions are designed to eliminate competition and lower cost QSF offerings, allow EPTC to enjoy a monopoly in the QSF industry, and/or lessen any competition including from superior QSF offerings.

125.    The EPTC Conspirators' ongoing anticompetitive actions have caused and continue to cause economic damages and irreparable harm to Flatirons' and Wyoming municipalities and businesses operating in the QSF industry.

126.    Absent an injunction enjoining EPTC Conspirators from their ongoing campaign of intimidation and harassment of QSF competitors, such as Flatirons, Lovell and Glenrock, and other businesses such as legal counsel, Flatirons will no longer be able to offer QSF's.

127.    Lovell was already intimidated into breaking its contract with Flatirons.

128.    EPTC Conspirators are still actively interfering with the Glenrock Agreement, with the intent to cause Glenrock to cease working with Flatirons.

129.    Without the partnership of a municipality, such as Glenrock, an institution such as Flatirons cannot offer QSF products.

130.    Pursuant to WS 40-4-114(b). Flatirons seeks an injunction against EPTC's

continuance of acts in violation of 40-4-114, including intimidation of Wyoming municipalities and other businesses involved in QSF offerings, such as legal counsel, and to cease causing publication of materials stating or implying untrue statements that Flatirons engaged in any illegal behavior in the design and operation of Justice Escrow.

131.    Flatirons is also entitled to the actual damages sustained in an amount to be proven at trial and its reasonable attorney fees and costs pursuant to WS 40-4-114(b).

## X.    JURY DEMAND

132.    Flatirons demands this case be tried to a six-person jury and has paid the jury fee.

## PRAYER FOR RELIEF

WHEREFORE, Flatirons respectfully requests that judgment be entered in its favor and against EPTC as follows:

1.    Awarding Flatirons compensatory, punitive and other damages in an amount to be proven at trial;

2.    Awarding Flatirons its attorneys' fees and costs;

3.    Awarding Flatirons pre-judgment and post-judgment interest;

4.    A Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction against EPTC, enjoining it from sending harassing, intimidating and/or defamatory communications to Flatirons' business partners;

5.    Awarding Flatirons treble damages, attorney fees and costs, and pre-judgment interest.

6.    Declaratory Judgment that there is no binding contract between EPTC and Flatirons;

7.    Declaratory Judgment that the "Terms and Conditions" browserwrap on EPTC's web site does not create a binding contract with anyone using the public website;

8.    Declaratory Judgment that the Justice Escrow platform coding is not a copy of the coding underlying EPTC's online QSF platform; and

9.    Awarding Flatirons any such further relief that the Court deems necessary and proper.

Dated this 22nd day of September 2025.

Respectfully submitted,

*Filed electronically and the original signature is on file at Crowley Fleck PLLP*

By:   /s/ Timothy M. Stubson
Timothy M. Stubson (Wyo. BAR No. 6-3144)

**CROWLEY FLECK PLLP**
111 West 2nd Street, Suite 220
Casper, WY 82601
tstubson@crowleyfleck.com
Telephone:  307-265-2279

and

Kevin T. Schutte, TBN 24033050
(*Pro Hac Vice* Forthcoming)
William P. Dunne III, TBN 24097631
(*Pro Hac Vice* Forthcoming)
**OTTESON SHAPIRO LLP**
4851 Lyndon B Johnson Freeway, Suite 650
Dallas, TX 75244
Telephone: (214) 619-8309

*ATTORNEYS FOR PLAINTIFF*

**Plaintiff's Address:**
1095 Canyon Blvd.
Suite 100
Boulder, CO 80302

4936-4815-2673